May it please the Court, I'm Tom Crist. I represent Defendant Hanken, and I would like to reserve five minutes for rebuttal, please. All right. This is a 1983 case alleging retaliation for speech, and there are two remarkable things about it compared to other retaliation cases you may have heard. And the first is that we don't really know what the speech was. In the usual case, the plaintiff claims, I said this about that to this audience, and I got punished for it. And it's important to know those things because not all speech is protected. It's only protected when the employee is speaking as a private citizen about a matter of public concern, and even then, the employee's interest in speaking has to outweigh the employer's interest in preventing disruption in the workplace. And if you don't know exactly what was said when to whom under what circumstances, it's hard to make those determinations. Well, okay, in your reply brief, you argue that no case clearly establishes that a person can violate another's First Amendment rights by exercising his own First Amendment rights, at least when the speech itself does not include a threat of adverse action. Your argument, in my way, from my perspective, assumes that Mr. Hankins' speech was protected by the First Amendment. Do you concede that retaliatory speech that is not protected by the First Amendment may be considered as a part of a First Amendment retaliation claim? No, I don't. But my threshold point is I don't believe that this is protected speech. And even before that, I don't believe there is enough evidence in the record for that determination to be made because you don't know what Mr. Grison allegedly said, which allegedly led to the retaliation. If you look at the testimony... Well, there is evidence that your client was aware that he'd said something and that your client indicated that he should stay on his side of the building. My client said that after a budget hearing when the plaintiff did not speak in support of the budget that had been put forward by my client. But the plaintiff didn't say... I'm not sure how I understand the failure to support at a budget, and I take it that was the city council budget, how that leads to the comment. And I don't understand why an inference couldn't be drawn from that evidence that, in fact, your client believed that plaintiff spoke to other people within city government and he wasn't supposed to do that. No, the comment that you're talking about was he did not speak in support of my client's presentation. But what you do not have here is the comments made to other people, and there is no evidence of that in the record. What you have here is plaintiffs saying, I was concerned about two aspects of city finances. He was concerned that the city was paying bills after waiting a while, and he was also concerned that the city had hired an auditor, a new auditor, who, unlike the auditor before, did not come to city hall to gather documents but had them sent by e-mail. Now, he did not say at any point, I spoke to this person about those events. I said this about those two concerns to this person, and it got back to defendant, and as a result, I was retaliated against. All he said was, I was concerned about these things. And if you don't know what exactly he said, the problem is you cannot determine whether what he said was expressed as a public concern, as a private citizen about a public issue as opposed to a personal grievance. All right, but they, but okay, the jury heard a lot of things, and they were instructed about the private versus public. And there's evidence in the record about, I guess this is a small town, that Mr. the Chief Grison spoke to council members at the grocery store or something about some of this. So the jury could infer from that that he was speaking as a private citizen. But the conduct here, I'm just sort of looking at the whole thing here, and I'm having Mr. Hinken's conduct as presented to the jury, which they obviously believed, was quite aggravated in terms of the jury heard evidence, including Mr. Hinken's own admissions that he intentionally misrepresented facts about Mr. Grison to the press, and that he did so for the purpose of getting Mr. Grison fired. For over 50 years, it's been clearly established that defamation, even of a public official, is not protected by First Amendment where there is actual malice. What's your argument that Mr. Hinken's retaliatory speech was protected? Because the key to plaintiff's case is I made a speech, I spoke, plaintiff has to prove I spoke, and I was punished for it. So the first step you have to find out is what did you say for which you were punished? There's no evidence of any statements. There's evidence that he contested that your client was possibly paying bills not according to what the process was, that he was fooling around with when he paid bills relative to both his department, to other departments. There's evidence that there was a conversation at the grocery store with a councilman, and there's the evidence of your client saying something like something, letting them know, hey, you better be on my side of this. The jury heard things like that. Why can't they make those inferences? Because there's no evidence and there's no way that they can infer that he said something about those matters. The only two things, the audit, new auditors, and paying bills late, there's no evidence that plaintiff said something about those for which he was punished. There was evidence that he was concerned about those things, but not what it is that he said. And the reason why you need to know what he said is that the key in all of these retaliation cases, are you speaking as a private citizen or are you speaking as a public employee? And the jury found he was a private citizen, right? They were instructed on that. They should not have been presented with this issue. If you don't know what he said, you can't figure out whether plaintiff was speaking as a resident and taxpayer in this town who was concerned about how city finances were being conducted or whether he was speaking as the head of the police department involved in the budgeting process who's upset about the way the process is going and affecting him and his views. And you have to be, as a matter of law, that yours would have to be the only inference that it was public in order for you to prevail. And that would have to be your position, because otherwise then it goes to the jury and the jury obviously was instructed on the private versus public and they found he was private. So you have to win as a matter of law on that point. Well, yes, we're concluding that we should have received a judgment as a matter of law, so that is our position. But they can't prove that he was punished for his speaking when you don't know what the speech is. Well, except there was his, on the issue of whether Mr. Greisen spoke as a citizen on a matter of public concern, isn't it meaningful that he spoke on overall city budget issues, not just police department budget? And if so, why not? Well, the fact that he spoke on overall issues means that he was involved in the overall budgeting process, but that was all part of his duties. What is key here is that, A, he did not speak externally. He didn't go to the press. He didn't sit down with an investigative reporter. He didn't write an op-ed piece. He didn't post anything on Facebook. The only people he talked to were people who were in his chain of command, which included the city councilors who spoke to department heads all the time. He didn't go outside and complain about things, which is probably the best indicia of your intent to speak as a private citizen. But did you argue that in front of the jury? Were you the counsel at the jury trial? I was not the counsel at the jury trial. So did counsel argue that at the jury trial? I don't recall if that was in the closing argument. That was certainly in the briefing. Well, but the jury was instructed on the private-public part of it, correct? Yes, but in order to make a finding that he spoke as a private citizen about a public matter, the jury has to know what he said. They can't just surmise. I'm not hearing an argument from you now that I saw in the brief. I mean, I saw lots of arguments in the brief saying that there wasn't enough evidence to support a proposition. The brief says, for example, this is opening brief, page 28. While there is some evidence that plaintiff spoke in contravention of defendant's orders, that lone consideration is not enough to transform employee speech into citizen speech. I do not see anything here that says we don't know what plaintiff said. And so how could jury reach a verdict if they didn't know what plaintiff said? What exactly is your argument? Because I don't understand it. Your Honor, I think we did stress at length that you need to know specific, both the opening and the reply. We make the point with citations to relevant authorities that you need to know with particularity what was said so you can make a determination whether it was public. I'm sort of lost. And this isn't — I mean, I'm really not trying to be critical. I'm just adrift, not understanding what argument I should tether to. We do discuss — I'm looking at the reply brief. Starting on page 9, we talk about the cases that say that we have to have what this Court calls the content, form, and context of the speech. And we go on to say — If you're starting in the reply brief, that's not a good sign. But, okay. I don't want to waste much of my argument now on finding that. Well, you wanted to reserve. Why don't you look through that? I will. And when you come back on your rebuttal, you can be more specific with Judge Clifton. Okay. And look in your opening brief, probably. Okay. But the instruction which included the but-for causation and a reasonably receivable requirement, why — can you explain how that instruction failed to allow the jury to consider an intervening cause? Your client launched several investigations which turned out to be unfounded, went to the press, said he went — That is not true. I'm sorry to interrupt, Your Honor, but it is not true that they were unfounded. And this is a mistake that the trial court made when he described the investigations as meritless. All three were meritorious. All three resulted in reports that were critical of the plaintiff. Two of them found substantial violations by the plaintiff of city policies involving pursuit of fleeing vehicles and handling of city funds. They were not unfounded. They were not meritless. Those were investigations that resulted in reports that were critical of the plaintiff and found him in violation of city policies and procedures. They were investigations not by my client, but by an independent investigator. And the investigations, if I may also point out, were not a result of complaints by my client. They were complaints about the plaintiff who went outside and hired an investigator. Well, I'm going to say I guess they heard evidence that they were discredited because the investigations didn't interview certain other people who later said that they felt that the, I don't know, the pit stop or whatever you call that, that maneuver, then there was someone that complained, and then that was about — and then there was the $2,500 that your client admitted that he knew. My client did not conduct the investigations. They were, I think, thorough, but in any event — I'm going to give you some time for rebuttal, but I have a question. Do you represent him as a representation, as the city, or is it, how does this work? Where is the city in all of this? The city was dismissed pretrial. I am representing him individually on behalf of the pretrial insured, so that's what I'm doing here. Thank you. Good morning. May it please the Court. My name is Bill Drew, and I represent Doug Smith. I just want to go on, what did the jury hear about the private public? Sure. I can give you that. What was the evidence on that? They were instructed and they did — so as I understand the appellant's counsel is making the argument that as a matter of law, all of the evidence, that they should have won, that it was clearly he was speaking in his public capacity. So what inferences can be — you know, what testimony did they hear? Okay. With respect to Councilor Judy Ingham, who was a city councilor elected official not in his chain of command, he did not report to her. He spoke to her about the allocation of the overall budget, that's at ER 143. Lots of issues under the budget, new parks, swimming pool, air park development, all facets of the budget, not just the police department, that's ER 127 to 28. Discussions were not limited to Council meetings, and when he was in uniform, he also spoke with her in the grocery store, that's ER 131. She said, one thing about my relationship with Mr. Grison is that the thing we had in common was the city of Scappoose. So all of this, the majority of discussions, was all about the city all the time, because that's where our focus was and that's what we had in common. Mr. Grison was very involved in the community and was interested, as all the councilors were, in what was going on in the community. That's at 128. They spoke at Ms. Ingham's house. What was the evidence that the jury heard of what the conversations was? Because I'm understanding appellants counsel to say we have to know what was said, and they said they don't know what was said. The evidence was that they spoke about the allocation of the overall budget. That's with Ms. Ingham. With Councilor Getlitch, they talked about this end-of-year budget balancing practice and the new audit reports. Now, with Councilor Getlitch, it's clear that he had concerns about the new auditor, because the new auditor was not coming on the campus. He wasn't getting information from individuals. Mr. Hankin was sending the information to him, and he wasn't using generally accepted accounting principles. And he testified at ER 168 and 69 that he told Councilor Getlitch that before the investigation started. Well, okay, so what was the testimony before the jury about you better be on my side or something along those lines? Who testified to that and that? That was testimony that Mr. Hankin said. And what did Mr. Hankin say that the jury heard? I'm mad at you. You stay on your side of City Hall. And he took that to believe that I don't want you talking to Ingham about the budget. I don't want you talking to anybody else. You stay on your side of City Hall. The City Hall is actually divided into the police department and the rest. And so he told them to stay on his side. What did the jury hear about when that comment was made relative to the other conversations? Was it given any time proximity? Yes. It was during the same time that he was talking to Ingham about the overall budget. It was during the same time as all of these things. I mean, I could go on. He talked to four city councilors and four department heads about matters that were arguably outside the scope of his employment. And as we know, the jury found that he did speak outside the course of his employment. The defendant is certainly correct. This is unlike most retaliation cases because, as you just defined it, the people he spoke to were people involved with city government. And the subjects he discussed all involved city government. The question becomes, is the fact that they weren't uniquely limited to the police department, does that somehow translate this into speech outside his capacity as a city employee? Yes. Are there other cases you can point to where the circle is all about the city and yet it's still deemed to be a matter of First Amendment speech? I would point you to Ng versus Cooley. That case involved a D.A.'s office, not a police department's office, but there was speech. That was also that one of the differences between this case and that case is that case, like most cases, came up on interlocutory appeal after a motion for summary judgment on qualified immunity. And on that case, your Court, this Court, was reviewing the evidence in the record on summary judgment to see whether there was any speech that could be outside the scope of his employment. Now, in that case, there was lots of speech inside the scope of his employment, the D.A.'s employment, but there was speech that was a comment, just a comment about whether the D.A.'s office improperly leaked information to the IRS. And the Court said, that could be outside the scope. The scope of the employment is for the jury, and we'll remand to the jury to make that determination of whether this is inside or outside the scope. And if they believe the plaintiff this is outside the scope, there is no qualified immunity, because the law is clear and the jury decides the scope of employment. Now, in our case, the jury was instructed on the scope of employment. There was no disagreement about the scope of employment. The plaintiff and defendant both testified that he was responsible for the police department and the police department's budget, but not the rest of the city, not the rest of the city. The part of the problem is that we're talking about a small city, a limited budget, finite, well, even in big governments, you have disputes between government agencies as to who's going to get a larger cut of the pie. And so it could easily be argued that the police chief's concern about the city budget isn't limited to his slice of the pie, but is also concerned with how big the pie is, what money is being spent where, and what is being spent by the police department. That's right. You could argue that, and they did argue that, and that was sent to the jury. And the jury decided the scope and determined that this was outside the scope, because there was many — there was lots of evidence that he was limited in his role to the police department. Even Mr. Hankin testified that when he prepared the overall budget, he didn't gather all the department heads together and talk about that. He met with them individually. He sent them off to do tasks and bring it back to him, and he compiled the budget. He was very clear about that. Well, so it needs to be, if as a matter of law, if giving all inferences to your client, that, I mean, he would have to argue as a matter of law that we give all inferences to you, that this was not private speech. Because once it goes to the jury, if as a matter of law he was entitled to keep that, you know, that it was public speech as a matter of law, given all inferences, then it shouldn't have gone to the jury, because juries don't always do the right thing. Right. He has to argue that as a matter of law, he can't tell what the speech is, and neither could the jury. I disagree. The jury heard that he had what his concerns were, that they were about the audit function and about this practice of withholding invoices at the end of the year. And he — they heard that he asked questions to other department heads. Doesn't say what the question was. He doesn't say, I asked him this question and I read it. But he does tell you what he learned. He learned that it was a citywide thing, and other department heads were also having their invoices withheld. So we know what the question was. And questions are speech. Questions can be — CONIC stands for that. Well, Mr. Hinken also argues he cannot be liable for his retaliatory speech. In drawing the line in this area, how do we determine whether a defendant's speech can be the basis for a First Amendment retaliation claim? So in your view, would a defendant simply disclosing to the press the fact that the plaintiff's under investigation be grounds for retaliation? Where do we draw the line here? Well, we draw the line as they did in Nunez and Gini and Gilbrook and Cozalter. All these cases involved speech. And Gini and Nunez said speech alone is not enough. Both those cases, I think, involved plaintiffs who were not employees, were private citizens. But they said that speech combined with the loss of a plaintiff's speech was not enough. And the claim that the defendant is not liable for his retaliatory speech, that the plaintiff did not have a tangible right or a benefit, is enough. And here we have, as in Cozalter — Well, did the jury — I asked Appellant's counsel, and I think he disagreed with me, but did the jury hear evidence of Mr. Hinken's own admissions that he intentionally misrepresented facts about Mr. Greisen to the press and that he did so for the purpose of making a supplemental excerpt of record in its full form? I encourage you to read it, because it's striking. Well, I had it in my notes, but Appellant's counsel did not agree with me on that, so I just wanted to hear. I believe it's near the end of the cross-examination, and the question was, you know, so you went to the press with these false allegations that you knew were false because you had heard the city counselors were sending e-mails, and the one you received was that they wanted to end the investigations of Mr. Greisen, and you didn't want that. And he said, that's right, I didn't want that. So, essentially, the inference is, I was on my way out, I had already resigned, but I had not left office, I wanted to make him too hot to handle. So I went to the press, I gave them this inflammatory photo, and I burned him down. And the photo is of the money? Yes. So what did he, what did Mr. Hankin admit about what he knew about the money? He agreed on cross-examination that while he said this was an unauthorized account, that he had no account of the money, that it was a badge. That's what he said to the press, that he knew all those three things were wrong. That he had received a memo, a written memo, that went into evidence from the lieutenant saying, I know that there's money in the desk, I'd like to get the keys so that I can count it. Not that he discovered it when he was looking for a badge. That he, that the account was actually authorized, that he had contributed money to it. And that he had never even sought an accounting from the city chief, Chief Gryson at the time. He never talked to Mr. Gryson. So all those things he admitted in cross-examination. All right. So just from your perspective, that what was the evidence of adverse employment? And then at the end of it, counsel for the appellant said since he did, since he did, he left six months before Gryson. And that's when Gryson was actually fired. That, that he cannot be responsible for Gryson's firing. So can you tell me what the adverse actions that were, that from, that you presented to the jury? We presented, I believe, nine different adverse actions to the jury, starting with, well, there were three investigations that were a sham for our concerns. They, they say that they were independent and non-retaliant. He testified that they were independent and non-retaliatory. The jury didn't believe him. And we submitted lots of evidence of pretext and retaliation for those three. There are also reports to the press that, this was an interesting, at the very beginning, after the first investigation, there was a disciplinary letter saying you're disciplined, you've lost two weeks' pay, you're docked two weeks' pay, go home. In that letter, there was a threat, and it said, as I read, as I write this letter, I can't help but believe you may not be able to, and I'm paraphrasing, maintain your position if this was known to or disclosed to the press, this, this investigation. That same day, he sent them an email, which is also in the record, about the city's policy not to discipline, and that it was unnecessary for anyone to know that he'd been disciplined, not even his lieutenant. But as soon as he appealed that discipline, Mr. Hankin went to the press, disclosed the, the investigation, not only that investigation, but another investigation that hadn't even started yet, both against city policy, both in the form of a retaliatory report, investigative report, which was found later by the personnel review committee to be completely biased. So there was that. There was also a ban from all public property, gag orders that he could not speak to the press, not just the press. He couldn't speak to anybody but his lawyer and his wife about city matters. He was placed on administrative leave after his two-week suspension, and he remained on administrative leave throughout the rest of Mr. Hankin's tenure. In fact, Mr. Hankin testified that he never spoke to Mr. Gison again during that whole time, while he initiated another investigation for, I think it was workplace, hostile work environment, which was found to be meritless. And then, finally, the last investigation over these accounts, charity accounts that he kept in his drawer, that everybody knew he kept in his drawer. He had been doing that for years. Hankin had even contributed to those amounts. So this was not new, but that claim was jump-started right after the PRC came out in favor of Mr. Gison. In favor of Mr. Hankin on the first investigation. In favor of Mr. Gison on the first investigation. So immediately after the PRC released its report saying this is completely retaliatory, Mr. Hankin called the third investigator and said, let's get going. So the jury has decided that all of that was retaliation. And this is similar to the retaliation in Eng and Kozolter. If you need a case that's similar, those were also patterns of lengthy retaliation, a campaign of humiliation, including false accusations. So, all right, so now I think what his argument was that the causation jury instruction failed to allow the jury to properly consider Mr. Hankin's intervening cause theory, because it did not include the word direct before the word cause. And so I want you to tell me exactly. And what I asked him was, can you explain how the instruction, which included but for causation and a reasonably foreseeable requirement, failed to allow the jury to consider an intervening cause theory? So was it argued in the trial that Mr. Hankin was not responsible because he didn't actually fire him? Yes, it was argued in closing argument. And that's in the record. All right, so what else was in the record? Okay, so was the instruction but for or reasonably foreseeable? Yes, and caused. Was Mr. Hankin denied, did he present an instruction that said was the direct cause? No, in fact, in trial, he objected to the instruction on causation because it did not include the holding of Lakeside Scott. And it was all about their argument. We went back and forth on this two or three times with the judge before that jury instruction was settled. And every time they came back and said it has to include the holding of Lakeside Scott, well, Lakeside Scott was as a precursor to liability, you have to show that the adverse action was substantially motivated by the speech. And in Lakeside Scott, the adverse action was discharge by a later person, a supervisor. And so in order to even reach liability, not causation of damage, but liability, they had to determine whether the motives of a junior were implicated to the senior. Okay, so if he, the actions that happened, so that he appealed through personnel, none of those were actually ever sustained against him. Why did he get fired? It was discretionary, right? And what did the new city manager say why he was fired? Well, the city, new city manager said he reviewed all three of the retaliatory reports, and we can call them retaliatory reports because that's what the jury found. And he also had read the reports in the press. There was a lot of controversy in the press. He said that cities can't operate with that kind of controversy. It needs to be resolved. And that he thought the best thing to do was terminate him for no cause. So the idea that it was a completely independent decision that had nothing to do with what Hankin did is wrong. And he testified to that. Okay, I think I've taken you a lot over, so I'm going to give counsel on the other side additional time. Does anyone have additional questions from the panel? Okay, thank you. All right, I'm going to give you five minutes for rebuttal. Thank you, Your Honor. First, to return to Judge Clifton's question, starting at page 28 of the opening brief and continuing for the next several pages, you will find the discussion about the need to know what the statement is, which is the point I tried to make in my opening argument. It begins with a quote from the United States Supreme Court. Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of the given statement. And continues on with other cases saying we need to know the details of the speech, including details of content, form, and context. And the reason why that is so important is because when the plaintiff meets with the city counselor, and according to his testimony, we talked about city affairs or even the budget, whether it is a public concern or a private concern depends on what he said. He could say, I'm a taxpayer and I am annoyed at the way the city is spending my tax dollars. That's a public concern. Or he could say, I'm so ticked off at Mr. Hankin because he shuts me up at budget meetings. That's a private internal grievance that does not get protection. Well, okay, but the district court, my understanding is the district court said, insofar as Mr. Greisen spoke on matters involving the police department's finances, he did not speak as a private citizen. Did the district court say that? I don't recall that. I think that there was a ruling to that effect, but the district court still let it go to the jury. So the district court must have felt that there were some issues. Well, if he thought it was not speaking as a private citizen on a public concern, then it should not have gone to the jury. There is no claim. What's the legal issue? I mean, the jury was given instructions to determine whether he was speaking on a matter of public concern and whether he was speaking as a public citizen or private employee, and the jury reached its verdict. So I take this to be a sufficiency of evidence challenge, but it's not posed that way. It's not, Your Honor, because whether or not the speech is protected, which is, again, whether it's a private citizen speaking on a public concern or a public employee complaining about an internal grievance is a question of law for the court. It's not a question that you give to the jury. That's why we were entitled to judgment on it, because that's the decision the court has to make, and to make it, it has to know what was said. Well, but can't it be? It can be a legal issue, but a court could also say it's a triable issue of fact that has to go to the jury, because speaking outside of the police, because my understanding is the district court said if he was speaking about the police department, that was public, but there was other speech that was presented, and the jury was asked, is that public or private? So if you feel there's a triable issue... The jury, there can be a question of fact in terms of what was said. If the plaintiff says, I complain that you're wasting my tax dollars, and the other side said, no, that's not what you said. If I complain that I'm not happy at budget meetings, and I'm unhappy with the way I'm being treated, that's an internal matter. There could be a dispute about what's being said, but once you know what's said, then you can determine whether it's protected or not. If you don't know what is said, and counsel never explains, because it's not in the record, what he ever said to anyone he was talking to. He just said, I talked to people because I was concerned, or he said suspicious, about what? Well, you're paying bills late. He never even said paying bills late is unlawful or improper, and in fact, it happens all the time. You pay your bills when that creditor complains. My clients don't pay my bills on time. There's nothing wrong with that, and they don't contend that there's anything wrong with that. And as far as the auditor, all he said was the auditor doesn't, the new auditor doesn't come here to get the documents. Instead, they email the documents to him. There's nothing wrong with that. The public doesn't care about that. I have a question. On the jury instruction 14, the instruction was, if you find the plaintiff made comments or asked questions about the city's budgeting or financial management practices in other departments or offices, beyond the police department, then making these comments or asking those questions constitutes speech on a matter of public concern. Sorry for my voice, but I can't help it. Was there an objection to that instruction? There was this objection, Your Honor, as a matter of fact. As I recall, as we said, this is a matter of law for you to determine. If you determine as a matter of law that comments about other departments' budgets is a public issue and private speech about that issue, then that's an accurate instruction. But our point is that's not true. He's involved in the budgeting process, and as Judge Clifton pointed out, what goes in one budget comes out of the other. And he is a head of a department. He's intimately involved with the budgeting process. So the whole thing is part of his duties. And the chain of command does extend to the city council, because he explained, we talk to city councilors all the time. That's how they find out what's going on. So I urge the Court to... Is the city council his boss? He reports directly to the city manager, but he says at all times he talks to the city councilors, and, of course, they can overrule the city manager, which they did when he was suspended. The last point I'd like to make is this. The jury could find that my client retaliated, did things adverse to the plaintiff. No question about that. They could find that. He didn't like him. He was mad at him. He said it at one point. What they cannot find on this record is those adverse actions included firing him. The damages could not possibly be found by a reasonable jury on this record. More importantly, they cannot find that any of those adverse actions were the result of anything that the plaintiff said, if he said anything, because we don't know what it was. Well, what is your best case for the authority that if everything he said about him and everything that he did was the reason that the plaintiff did it? That the new city manager fired him, that he can't be held responsible? What's your best case for that? That he, that a case that says if you, you must actually fire the person to be held responsible? I think, I don't know a case, I just say, would contend that the termination has to be related to what we did. If our retaliation did not result in the termination, because the decision was made for other reasons, those two can't be connected. And because most of these damages are termination-related, there would need to be a new trial on those grounds. But... Can he be held responsible for adverse actions that were taken prior to the termination? I mean, there were adverse actions. I mean, being put on administrative leave, being suspended. Let me put it this, and I don't want to put too fine a point on it. He can be held responsible for damages for adverse actions, pre-termination, if, if he can say that that retaliatory action, the adverse action, was a consequence of something that you said, as a private person, about a public issue, and not as a consequence of internal, infighting, turfmanship between two heads of state. High-ranking officials in a public body. Okay. I think we understand your argument.
judges: Fisher, Clifton, Callahan